IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PETER ANDREW STINSON,<br><br>    Defendant. | Case No. 1:25-cr-209<br><br>Hon. Anthony J. Trenga<br><br>Motion Hearing: Oct. 17, 2025 |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

Defendant Peter Andrew Stinson's motion to suppress evidence seized pursuant to warrants issued pursuant to Federal Rule of Criminal Procedure 41, alleging that the warrant for Stinson's residence lacked probable cause, was overbroad, and insufficiently particularized, should be denied. *See* ECF No. 67 (the "Def. Motion").[1] Contrary to Stinson's claims, United States Magistrate Judge Lindsey R. Vaala was justified in concluding that the warrants were amply supported by probable cause and sufficiently particularized. However, even if she had erred in making that conclusion, the motion should still be denied because the investigators conducting the searches relied in good faith on facially valid warrants.

"The Fourth Amendment requires that, in the ordinary course, searches and seizures be conducted pursuant to a warrant issued 'upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' U.S.

---

[1] While the government obtained three separate search warrants, the government has informed the defendant that it does not intend to introduce in its case-in-chief any evidence obtained from two of those warrants—specifically, the warrants for his vehicle and for the content of his electronic devices. The government hereby represents to the Court that it will not introduce any such evidence in its case-in-chief. Accordingly, the only evidence at issue is evidence obtained from the search of the defendant's residence. This opposition, therefore, limits its analysis to the search warrant authorizing that search.

Const. amend. IV." *United States v. Qazah*, 810 F.3d 879, 885 (4th Cir. 2015). The test for the necessary particularity of a search warrant is "a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *Godbey v. Simmons,* 2014 WL 345648 *6 (E.D. Va. 2014 (Ellis, J.), *affirmed,* 577 F. App'x 239 (4th Cir. 2014), *quoting United States v. Davis*, 67 F. App'x 771, 777 (4th Cir. 2003) and *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979)).

"In making a probable cause assessment, a magistrate judge must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . , there is a fair probability that contraband or evidence of a crime will be found.'" *United States v. McNeal*, 818 F.3d 141, 150 (4th Cir. 2016) (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "When reviewing a magistrate judge's probable cause determination, a court looks to whether there was a substantial basis for the decision." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006).[2] "After-the-fact scrutiny by courts of the sufficiency of an affidavit should accord great deference to the magistrate's determination of probable cause." *Id.*

## ARGUMENT[3]

**I.     The Search Warrant Was Supported by Probable Cause.**

    A.  Stinson's Posts Dating Back to 2020 Provided the Necessary Context for the Threats He Made in 2025.

Stinson's numerous posts on X dating back to 2020 provided the necessary context and

---

[2] Unless otherwise noted, throughout this Opposition, the government has omitted internal quotation marks, alterations. *See United States v. Marshall,* 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[3] The government assumes the Court's familiarity with the factual background, as laid out in the Affidavit in Support of the Applications under Rule 41 for Warrants to Search and Seize, which is incorporated herein. *See* Def. Motion, Ex. 1 (ECF No. 69).

grounds for a finding of probable cause that he was threatening the President of the United States in 2025. Stinson argues that because the affidavit included information related to activity prior to 2025, the entire warrant is rendered "stale." *See generally* Def. Mot. at 8-9. Stinson's argument is unfounded. When faced with a staleness challenge of the sort alleged here, the court must determine whether the "facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched[.]" *United States v. McCall*, 740 F. 2d 1331, 1336 (4th Cir. 1984). In conducting its analysis, the court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.*

Here, the affidavit established Stinson's deep-rooted hatred of the President by highlighting posts he made as far back as 2020 which called for the assassination of President Trump and continuing up until just a few days before the warrant was sought. The inclusion of the information from as far back as 2020 did not, however, transform the entirety of the affidavit into one based on "stale" information. To the contrary, the affidavit's inclusion of Stinson's acts from as far back as 2020 and continuing up until just days before the warrant was sought "instead showed a continued course of conduct over an extended period of time" that demonstrated Stinson's obsession with the President's death and escalation in threats. *See United States v. Ginyard*, 628 F. Supp. 3d 31, 47 (D.D.C. 2022). The gap between the first set of posts on X primarily from 2020-2021 and the resurgence of his posts in 2024-2025 further underscores this point. These two time periods were periods when President Trump was either President, running for Presidency or contesting a presidential election. Other than one lone post in 2022, the gap in Stinson's posts from 2021-2024 marked a time period when President Trump had fallen out of

the limelight and was not triggering the defendant's rage and his calls for President Trump's death. Indeed, the "stale" posts here were crucial for Magistrate Judge Vaala to understand how deep-rooted and long-running the defendant's hatred for President Trump ran, which gave further color and context to the truly alarming threats made in 2025. *See also* Government's Reply in Support of its Motion *In Limine* to Admit Government Evidence, ECF No. 83 at 3-5 (further discussion regarding temporal proximity issue and how the older timeframe of Stinson's X posts strengthens his intent to solicit a crime of violence in 2025.)

Additionally, the defense is incorrect in arguing that "none of [Stinson's posts from 2020-2024] even mention any instrumentalities, such as firearms or poison." Def. Motion at 9. To the contrary, after the Butler assassination attempt on President Trump, Stinson made several posts about the failed attempt, including talking about what kinds of firearms are best to use for a similar assassination. *See* Aff at ¶ 35 (". . . And, btw, the AR is best for near to medium distances and shooting multiple shit quickly. For long distances, a specialized sniper rifle is a better tool choice."); ¶ 39 ("2 things I learned this year: The AK is great for killing people, but if your target is a specific target at distance, it's not the best tool. Don't write shit down. Learn to plan in your head, not on paper. & be sure to destroy all evidence before.") These comments were made alongside other comments about the need to "practice" if you want to "play in the big leagues" and learn about the right tools to carry out the job because "Execution is critical" and "luck is not a plan." *See*, Aff ¶¶ 33-39. Taken in context, these posts provided ample probable cause for a finding that the defendant had violated Section 871.

Indeed, as the defense itself notes, Jude Vaala was not the only magistrate judge to find probable cause in this case. A few weeks later, Magistrate Judge Ivan D. Davis found probable cause for a violation of 18 U.S.C. § 871 existed for the threatening posts Stinson made in 2025.

*See* Def. Motion at 10 (quoting *United States v. Stinson*, 1:25-mj-373, Transcript at 60:2-16 ("Under the entire context, the Court finds probable cause exists for the allegation as contained in the complaint from at least 2025 to the filing of the complaint . . .") And then, two weeks later, a grand jury indicted Stinson on two counts of violating 18 U.S.C. § 871. ECF No. 32. For these reasons, there were sufficient grounds for Judge Vaala (and Judge Davis and a grand jury) to find probable cause based on the facts set forth in the affidavit.

### B. Sufficient Nexus Linked the Criminal Activity Described to Stinson's Residence

The search warrant also articulated a sufficient nexus between Stinson's online threats to the President and his residence. "Under the Fourth Amendment, a [search] warrant must be supported by probable cause[,]" which "requires only a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sueiro*, 59 F.4th 132, 139 (4th Cir. 2023). Put simply, "[t]here must . . . be some nexus between the suspected crime and the place to be searched." *United States v. Orozco*, 41 F.4th 403, 409 (4th Cir. 2022). That said, "an affidavit need not directly link the evidence sought with the place to be searched." *United States v. Jones,* 942 F.3d 634, 639 (4th Cir. 2019). Rather, "whether a nexus exists is a practical, commonsense determination" that "may be established by the normal inferences of where one would likely keep the evidence being sought." *Orozco*, 41 F.4th at 409.

Here, Stinson argues that "there is nothing in the affidavit linking the alleged criminal conduct of Mr. Stinson to evidence – such as firearms, poison, or relevant electronic devices – being found at his residence." Stinson's argument is unsupported by the very case law he cites. At the outset, courts have readily, and repeatedly, found that certain possessions—including, as relevant here, guns and computers—are generally kept in the home. *See, e.g., United States v. Anderson,* 851 F.2d 727, 728-29 (4th Cir. 1988) (rejecting a defendant's challenge to the warrant

authorizing the search of his home for a murder weapon on the grounds that "the affidavit . . . contained absolutely no facts or conclusions" that the weapon would be found in his home, reasoning that because one would expect a person to keep a gun at their home, a magistrate judge could reasonably believe that searching the home might uncover the gun); *Peffer v. Stephens*, 880 F.3d 256, 272 (6th Cir. 2018) ("Just as guns, and other possessions, are generally kept in the home, so too are computers, and so we readily find a nexus between computers used in the consumption of child pornography and the suspected consumer's residence."); *Orozco,* 41 F.4th at 411 n.9 (recognizing "there are places so intrinsically part of a person's daily life that one would expect evidence of their crimes to be found there."); *United States v. Bosyk*, 933 F.3d 319, 325–26 (4th Cir. 2019) (concluding that the magistrate judge had a sufficient basis in finding probable cause that child pornography would be found on computers or other devices within the defendant's property where the affidavit established that someone using the defendant's home IP address had accessed child pornography).  In applying this standard in a case involving online threats, *United States v. Jones*—the same case Stinson uses to support his argument on the lack of a nexus—the Fourth Circuit easily found that "the magistrate reasonably could have inferred that [the defendant] had made his online threats from a computer located at his home." 942 F.3d 634, 639-40 (4th Cir. 2019); *see also United States v. Sueiro,* 59 F.4th 132, 140 (4th Cir. 2023) (where affidavit contained information that the defendant had committed the alleged crime by sending emails a few days before the affidavit was submitted, and that the defendant owned a computer that he kept in his bedroom, "it was substantially likely that [the defendant's] computer and any related devices" would be found "in his place of residence."). Indeed, *Jones* supports the existence of a nexus between Stinson's crime and his residence in this case.

Specifically, the affidavit at issue here established that Stinson was likely in possession of at least three electronic devices—two cellphones and a laptop. While Stinson evidently concedes that the affidavit set forth facts that established "he continued to actively post on social media accounts from his phone until the day he was arrested," Def. Mot. at 15, there is nothing to suggest that he exclusively posted from his phone. To the contrary, the affidavit established that Stinson made threatening posts from his Bluesky Account, and that the IP address used to access that account was one linked to Stinson's residence. *See* Def. Motion at Ex. 1 (ECF No. 69, the "Aff."), at ¶12. Just as in *Jones,* it was thus reasonable for Judge Vaala to conclude that Stinson had accessed his Bluesky account—one of the accounts from which he communicated threats to the President—from a laptop at home. *See also United States v. Kvashuk,* 29 F.4th 1077, 1086–87 (9th Cir. 2022) (finding affidavit reasonably established nexus between digital devices to be seized and defendant's home where affidavit contained evidence that home had internet access, and that internet protocol address associated with home was used to access defendant's email and cryptocurrency accounts).[4]

---

[4] Stinson also argues that the lack of probable cause to search his devices is "only confirmed by the fact that the government did not search any of the eight devices . . . seized from his residence nor did they find any relevant information on his personal cellphone." Def. Motion at 15. That is not the case. When the search warrant was executed and the devices were seized from Stinson's home, FBI was facing a lengthy delay in its ability to locally execute a forensic examination of the devices – at the minimum it was a 120-day backlog for any device, which would have likely resulted in completed examinations beyond the date of this trial. As a result, the government prioritized a forensic examination of Stinson's cellphone by utilizing an out of state FBI facility. However, due to the model and security features on Stinson's phone, the forensic examination was unsuccessful in thoroughly decrypting the data on the phone. As a result, it is inaccurate to conclude there was no probable cause because the government did not search all of the seized devices, as that was due to an administrative obstacle. Similarly, it is inaccurate to conclude that the government didn't find any incriminating evidence on Stinson's phone because it didn't exist. Rather, the government was simply unable to review *any relevant content*, including any communications, files, document drafts, etc. beyond unrelated data files.

Stinson is also incorrect in arguing the lack of a nexus because his statements were protected under the First Amendment. On the one hand, Stinson acknowledges that "threatening communications indicating that the defendant *himself* will engage in violence may support probable cause for a search," Def. Mot. at 11 (citing *Jones,* 942 F.3d at 639) (emphasis in original), but simultaneously argues that because "none of the statements contained in the affidavit *unconditionally* threaten violence," *id.* (emphasis added), that Stinson himself planned on carrying out, his statements were covered by the First Amendment and, therefore, the government failed to establish probable cause to believe he had committed any crime. *See id.* at 11, 13-14. There is no requirement that Stinson had made a threat that "unconditionally" threatened violence. That is not an element for a threats charge under Section 871 nor a prerequisite for a sufficient nexus finding here. *See United States v. Patillo*, 431 F.2d 293, 295 (4th Cir. 1970) (stating the elements of a Section 871 offense are (1) that a defendant said words that constitute a threats to kill, to kidnap, or to inflict bodily harm upon the President of the United States, (2) that the words were a "true threat," and (3) that the defendant made the threat knowingly and willfully).

Further, to the extent that Stinson is arguing that there were First Amendment protected statements that helped establish probable cause that Stinson had violated Section 871 and may have instrumentalities at his home that he could use to carry out his threats, such an argument is unpersuasive. While the First Amendment protects advocating for the use of force, *see Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), it "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). In *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014), the Second Circuit rebuffed a similar argument raised by a defendant in a material support for terrorism prosecution. There, a defendant challenged his conviction for providing material support to a foreign terrorist

organization, arguing that the admission of evidence of his extremist writings, political views, and the videos he watched violated the First Amendment. As the Second Circuit explained, the defendant "was not convicted for his speech; rather, his political beliefs were introduced to prove the *mens rea* element of the charged crimes." *Id.*; *see also United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) ("[W]hile the First Amendment fully protects [the defendant's] right to express hostility against the United States, and he may not be prosecuted for so speaking, it does not prevent the use of such speeches or writings in evidence when relevant to prove a pertinent fact in a criminal prosecution. The Government was free to demonstrate [defendant's] resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States."). Similarly, here, many of Stinson's social media posts indicate that he possessed knowledge about how to harm the President, that he had motive and intent to do so, and he was clearly "planning" something while talking about wanting to kill President Trump Even more so, on one occasion, after repeatedly saying he thought he didn't have the skills to assassinate the President, Stinson wrote:

> "You know you need to find me. Maybe I'm lying. Maybe I do have the skills. Maybe I've got it all figured out how to pop the orange ball. Or maybe I don't. It doesn't matter. People will try. We pray for success."

Aff at para 53. This post, in the context of his many others, was alarming and provided reason for a finding of probable cause to search Stinson's residence of evidence of what he was planning. *See United States v. Young*, 260 F. Supp. 3d 530, 545 (E.D. Va. 2017), *aff'd*, 916 F.3d 368 (4th Cir. 2019) (concluding that the defendant's non-criminal speech could properly be considered in the court's probable cause analysis, as the challenged comments "indicate that he possessed knowledge about how to harm government employees and the motive to do so.").

Finally, the defendant in *Jones* raised a similar argument—one that the Fourth Circuit easily dispensed with in a footnote that should guide the court in this case:

> We also reject Jones' argument that the evidence sought in the warrant exceeded the scope of the West Virginia statute, which governs terrorist threats, not terrorist acts. The magistrate's decision to authorize a search for the instrumentalities Jones might use to carry out his threats was plainly reasonable. At a minimum, physical evidence indicating a plan or ability to commit a terrorist act could be used to show that Jones, in fact, intended his statements as threats of future violent acts. Thus, we hold that the evidence sought by the warrant was well within the scope of W. Va. Code § 61-6-24.

*Jones*, 942 F.3d at 640 n.2.

Stinson's argument that the Affidavit failed to establish probable cause to believe he actually owned any dangerous weapons in his home is likewise easily dismissed. As he concedes, the affidavit included the Bluesky account post from March 4, 2025, that read: "Target practice tonight. I set some [orange emoticon] on the railing. Let's shoot some oranges! Plink. Plunk. Boom. Bop." Def. Mot. at 13. However, this post, especially his reference to engaging in target "practice" must also be considered in context. First, right after the Butler assassination attempt, Stinson made numerous posts about firearms, how to use them, which type of firearm would be the best one to use in an assassination if the target was far away as opposed to close by, and generally provided other information suggesting he has significant experience with firearms. Second, in the context of criticizing the Butler shooter for missing his target, Stinson repeatedly encouraged anyone who wanted to "play in the big leagues" to "practice, practice, practice" because "execution is critical." Third, as explained above, in February 2025, Stinson kept referencing "planning" something. Finally, Stinson does have a history as an award-winning sharpshooter, and has obsessively been commenting about wanting the President to die since 2020. In consideration of all of these factors, Judge Vaala had a sufficient basis to conclude that "physical evidence indicating a plan or ability to commit" the violent acts he threatened—specifically, a

firearm—would be found at his residence. *Jones,* 942 F.3d at 640 n.2. And such evidence would be relevant "to show that [Stinson] intended his statements as threats of future violent acts." *Id.*

Just as unpersuasive is Stinson's argument that his "general references to 'poison' in two media posts" didn't establish a fair probability that poison would be found at his residence. *See* Def. Mot. at 13. First, taken in context, Stinson made more than mere "general references to poison." The government saw that Stinson had been posting about wanting President Trump dead for a long period of time, and then, right after Inauguration, the threats escalated significantly. On January 29, 2025, Stinson stated "Poison maybe. But you got to get real close." Two days later, on January 31, 2025, he more affirmatively stated "Poison. That might be the only solution at this point. Take out 1 and 2. Got to get close to disperse. Need a *plan*. Anyone done this sort of work before?" (emphasis added). Then, in the context of his request for a plan, within a week he made the following three stream of consciousness-like posts three days in a row about *planning* something:

> February 6: "Right now people are planning. Individuals and groups of people. Some plans will come to execution. Some will die early in the planning stages. With luck, one team will succeed against the odds and carry their plan through execution to a successful outcome. May any team succeed. Please."

> February 7: "The planning continues. Options discarded. More options created. Looking for an opportunity. A hole in the wall. Only need one. Pick the time. Pick the place. Planning offense not defense. Turning over variations to face and the best plan, the one with the greatest chance of success. Get it done!"

> February 8: "Planning Consideration How much collateral damage is appropriate? If, say, two of the top three targets can be completed, what sort of collateral damage is ok." and "I'd say other fascists and [orange emoticon] sycophants are fair game for sure."

Aff. at ¶¶ 48-49, 51.

Thus, at the time of Stinson's arrest and search warrant, the government truly believed in good faith, given the context of everything Stinson was posting, that he had been planning

*something* dangerous, likely related to harm President Trump based on the context of all of his other posts after Inauguration, and was a danger to the President of the United States. While there may not be one specific post that made it certain that he had acquired poison, there was sufficient probable cause, given the comments about poison and the context in which they were made about "planning," and wanting to harm the President, that the government would find poison in his home.

In any event, to the extent that this Court finds that Judge Vaala lacked a sufficient basis to find probable cause to search for poison at his residence, the severance doctrine would apply, invalidating only "the constitutionally infirm portion of [the] warrant," with only the evidence seized pursuant to that portion of the warrant being suppressed, permitting the remainder of the "evidence seized under the valid portion [to] be admitted." *United States v. Cobb,* 970 F.3d 319, 330 (4th Cir. 2020) (applying the doctrine to a portion of a warrant found overly broad but explaining the doctrine is also properly applied to portions of warrants lacking probable cause).

The severance doctrine would equally apply to the portion of the warrant that permitted the seizure of devices beyond those specified as Stinson's known devices in the Affidavit. *See* Aff. Attachment B at ¶ 16. Assuming, for the sake of argument, that the affidavit lacked probable cause to support the search of devices beyond those specified in the warrant, the language authorizing the search of any other devices can and should be "treated as merely superfluous" without invalidating the warrant as a whole. *Cobb,* 970 F.3d at 330. As for the specified devices, contrary to Stinson's argument, the magistrate judge did indeed have a sufficient basis to find probable cause for those items.[5] Again, given the nature of the offense, a cybercrime—specifically, its

---

[5] While the United States will not seek to admit the contents of the forensic examinations of any of the devices, it will likely introduce the fact that the defendant had access to and possessed the three specified devices, all of which were recovered during his arrest and the search of his residence, and each is an instrumentality, as opposed to merely a receptacle for evidence.

reliance on computers and personal electronic devices—provided a sufficient basis for the conclusion that probable cause existed that evidence and instrumentalities of the enumerated offense would be found on the devices he was known to possess. *See Jones,* 942 F.3d at 639-40.

## II.    The Warrant Was Sufficiently Particular.

As required by the Fourth Amendment, warrants must "particularly describ[e] the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "By having to state with particularity the scope of the authorized search, a warrant prohibits the government from having 'unbridled discretion to rummage at will among a person's private effects." *United States v. Zelaya-Veliz*, 94 F.4th 321, 337 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024) (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)). "At the same time, the particularity requirement is not a "constitutional straight jacket, and it should be not read to create a too-cramped understanding of the scope of a proper warrant." *Id.*

Recognizing that the particularity requirement is "a pragmatic one," the Fourth Circuit has repeatedly explained that "the degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *Id.; see also Cobb*, 970 F.3d at 327; *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981). While the case law recognizes that the degree of particularity may vary, one way to satisfy the requirement is "by identifying the items to be seized *by reference to a suspected criminal offense*[.]" *United States v. Blakeney*, 949 F.3d 851, 863 (4th Cir. 2020) (emphasis added); s*ee also United States v. Zelaya-Veliz*, 94 F.4th 321, 337–38 (4th Cir.), *cert. denied,* 145 S. Ct. 571 (2024) (finding particularity requirement met where each warrant identified the items to be seized by citation to the suspected criminal offenses and thus only permitted the subsequent seizure of the fruits, evidence, or instrumentalities of violations of enumerated federal statutes).

Here, each item sought to be seized was narrowed to its connection to "evidence related to violations of 18 U.S.C. § 871 . . . ." Aff. at Attachment B. As in *Zelaya-Veliz*, it thus only permitted the seizure of the fruits, evidence, or instrumentalities of violations of an enumerated federal statute and therefore was sufficiently particular. Accordingly, Stinson's motion on this basis should be denied.

Similarly without merit is Stinson's argument that the affidavit was overly broad in that it permitted the seizure of non-contraband items, including, specifically, the items Stinson seeks to suppress: a Mayday Flyer; a leather journal; the books Blueprint for Revolution, How to Spot a Fascist, Fascism – A Very Short Introduction, Terrorism – A Very Short Introduction; khaki uniform shirts and a camo army jacket; a box of military paraphernalia; handwritten notes on Mayday; and a pepper spray. Def. Mot. at 5-6. These items either link Stinson as the user of the account from which the threats were made—in other words, they are relevant for identity purposes—or are probative of Stinson's intent to carry out his threats.

The items related to Mayday, the leather journal, the coast guard uniform, box of military paraphernalia, and the two books all link Stinson as the user of the Bluesky account and other social media accounts. *See* Aff. at ¶ 12 (highlighting the links between Stinson and identifying information linked to the user of the Bluesky account, including the Mayday protest); *id.* at ¶ 67 (linking Reddit user account to Stinson, including by referencing Camp Mayday); *id.* at ¶ 70 (same with respect to Instagram account); *id.* at ¶ 31 (the "Very Short Introduction, Terrorism" book links Stinson to the Bluesky posts on May 6, 2024). Additionally, the books on Terrorism and Fascism go to Stinson's state of mind, including his self-proclamation as a member of ANTIFA, and his views on the need for violence and opposing fascism. *See, e.g.,* Aff. at ¶¶ 44, 51, 53. *See, e.g., United States v. Young*, 916 F.3d 368, 378 (4th Cir. 2019) (finding "Nazi paraphernalia . . .

14

relevant to or probative of material support for a terrorist organization"); *United States v. Manafort*, 323 F. Supp. 3d 795, 803 (E.D. Va. 2018) (recognizing that evidence relevant to establishing a defendant's state of mind "can often come from records and evidence separate and apart from, and unrelated to, the allegedly criminal transactions themselves."); *United States v. Tsarnaev*, 53 F.Supp.3d 450, 455-57 (D. Mass. 2014) (rejecting challenge to warrant that authorized seizure of "[p]roperty, records, or information related to the state of mind and/or motive").

### III. Even If This Court Were to Find Judge Vaala Lacked A Sufficient Basis to Find Probable Cause or that the Warrant Lacked Particularity, Stinson's Motion Should Be Denied Because the Officers Conducting the Searches Relied in Good Faith on Facially Valid Warrants.

A review of the affidavits submitted in support of the search warrant applications in this case leaves no doubt that the warrants were supported by ample probable cause. But even if probable cause were found wanting, the evidence should not be suppressed pursuant to the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 913, 920 (1984). In *Leon*, the Supreme Court held that evidence need not be suppressed when the police obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause. 468 U.S. at 913, 920. This "good faith" exception to the exclusionary rule is proper because suppression in this situation would not further the deterrent function of the rule. *Id.* at 918-20.

"[A] court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (*quoting Leon*, 468 U.S. at 922 n. 23); *accord Qazah*, 810 F.3d at 886 ("[I]n the ordinary course, the exclusion of evidence is not the proper remedy.").

The Supreme Court has reiterated that:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 129 S. Ct. 695, 702 (2009).

The Supreme Court has identified four situations in which police cannot be found to have acted with "objective reasonableness," and in which *Leon*'s good faith exception is therefore inappropriate: (1) when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant was "so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid," and (4) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923; *accord United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 923).

Here, Stinson argues that the good faith exception should not apply because: (1) "the affidavit contains false information," and (2) "the affidavit did not provide the magistrate judge with a substantial basis for determining probable cause to search his residence." Def.'s Mot. at 21-22 (citing *United States v. Lyles,* 2017 WL 5633093 (D. Md. Nov. 20, 2017)*, and United States v. Woodley,* 447 F. Supp. 3d 487 (E.D. Va. 2020)). Stinson's arguments are grounded in unfair assumptions and unpersuasive.

Regarding his false statement contention, Stinson cannot credibly argue that law enforcement lied in the affidavit when stating that they believed he may have access to firearms

simply because a records check came back negative and because he wasn't holding guns while out protesting on the National Mall the morning of May 7. Such facts simply do not support the conclusion that "law enforcement knew that Mr. Stinson did not possess a firearm." Def.'s Mot. at 21. At best, such facts support the view that law enforcement knew Stinson was not legally *registered* as owning firearms in Virginia. And that, the morning of May 7, he didn't have firearms on his person while out in public. Indeed, as defense counsel is aware, there are many situations in which an individual may have access to firearms that are not legally registered to them. Whether it be receiving firearms from another family member or friend, purchasing them in a situation where registration is not required, or obtaining them unlawfully by other means, there are numerous ways to possess an unregistered firearm. Also, people often commit crimes with guns that can't be traced back to them. Further, simply because Stinson wasn't carrying firearms the morning of May 7 while speaking to law enforcement is no basis for arguing that law enforcement *knew* he didn't own firearms whatsoever. That would be akin to saying he obviously doesn't own firearms because he didn't take them to the grocery store last Saturday. If Stinson had a firearm at home and was planning on committing a crime with that firearm, *of course* he wouldn't be showing off his firearm in public, on the National Mall with hundreds of people around, *especially* when speaking to law enforcement. Indeed, defense cannot argue in good faith that such facts are enough to conclusively establish that law enforcement *knew* he didn't have firearms and therefore *lied* in their application for a search warrant for his residence. Such arguments are entirely baseless, defy common sense, and should be rejected.

As explained above, the government did provide Magistrate Judge Vaala with sufficient basis to determine there was probable cause to search Stinson's residence. The government never mischaracterized or misled the Judge Vaala about any of Stinson's statements. To the contrary, the

government provided her with exact quotes for dozens of statements made by Stinson, along with their dates ranging from 2020-2025, both threatening President Trump and wanting President Trump assassinated. Such statements made clear that Stinson was actively thinking through the different ways to kill the President, simultaneously "planning" something, emphasizing the importance of "practice" for anyone planning to assassinate the President, and then declaring that he was "practic[ing]" his shooting skills. Given Stinson's statements and the contexts within which they were made, there was probable cause to believe that a search of his residence would reveal evidence and instrumentalities.

This case is distinguishable from the two cases Stinson cites in support of his argument that the good faith exception does not apply here— *United States v. Lyles,* 910 F.3d 787, 790-97 (4th Cir. 2018) and *United States v. Woodley*, 447 F. Supp. 3d 487, 494-95 (E.D. Va. 2020). In *Lyles*, the police sought a warrant to search the defendant's residence after finding three marijuana stems through a search of four trash bags outside the house, thinking a search would reveal evidence establishing possession of and intent to distribute controlled substances and money laundering. *Lyles*, 910 F.3d at 790-97. The magistrate judge authorized a search of the entire home, including any cell phones found therein, as well as "any and all persons suspected to be involved in said illegal activities." *Id.* at 795. The district court suppressed the four guns, marijuana, and drug paraphernalia recovered during that search, concluding "that the presence of only three marijuana stems . . . does not establish a fair probability that additional marijuana will be found within the home." *Id*. at 791. In affirming, the Fourth Circuit emphasized the Fourth Amendment's "reasonableness" requirement, opining that one dimension of reasonableness requires "proportionality between the gravity of the offense and the intrusiveness of the search." *Lyles,* 910 F.3d at 795. In *Lyles*, the underlying offense—possession of less than ten grams of marijuana—

was a civil infraction under state law, punishable by nothing more than a fine of $100. *Id.* at 796. On the other hand, the intrusion the warrant authorized "was anything but minor." *Id.* As the Court explained: "The magnitude of the intrusion relative to the seriousness of any offense is of central relevance to determining reasonableness, and this is especially the case when 'any and all' is the warrant's insistent refrain with respect to almost every category of personality that might conceivably be in a house." *Id.*

Here, by contrast, Stinson was repeatedly calling for the death of the President and threatening to kill the President of the United States himself. The gravity of such an offense, *especially* when compared to the offense at issue in *Lyles*, cannot be more apparent. As discussed at length above, the affidavit provided sufficient probable cause to search for each of the items Stinson seeks to suppress and, equally as important, it properly described those items with sufficient detail and limited those items to their connection to Stinson's involvement in making threats in violation of 18 U.S.C. § 871, including those non-contraband items that are relevant in proving Stinson's identity as the poster of the threats and intent behind his threats.

*United States v. Woodley* is likewise inapposite. There, the affidavit established that the defendant was stopped in an area near his residence with a distribution-amount of marijuana. 447 F. Supp. 3d at 491. The affidavit did not, however, establish that the defendant was in ongoing trafficking or any other reason to believe that he "possessed any more drugs than he had in his vehicle," such that there would be probable cause to believe that additional drugs would be found in his residence. *Id.* at 492-93 (highlighting that "in the investigation of a drug distribution offense, it is often unreasonable to suspect that drugs will be at the defendant's residence because when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor."). Again, as detailed above, the affidavit at issue here

included probable cause to believe that each of the items sought to be suppressed would be found in Stinson's home.

Accordingly, even if the Court were to conclude that the warrants were overbroad or lacking in probable cause, the Court should deny Stinson's motion to suppress under the good faith exception, since none of the factors that justify the high cost of suppression apply in this case. *See also United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (denying a motion to suppress on the basis of the "good faith exception" to the exclusionary rule where the search affidavit failed to state the time period during which the illegal activity occurred).

## **CONCLUSION**

For these reasons, the Court should deny the Defendant's Motion to Suppress Evidence Seized From His Residence. ECF No. 67.

<div style="margin-left: 50%;">

Respectfully submitted,

Lindsey Halligan
United States Attorney

</div>

By:    /s/_____
Sehar Sabir
NY Bar # 5431762
Meredith Edwards
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
sehar.sabir@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send

an electronic copy to any attorneys of record for Defendant.

By: ___/s/_____
Sehar Sabir
Assistant United States Attorney
NY Bar Number: 5431762
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia 22314
sehar.sabir@usdoj.gov